IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

PATRICE SMITH,

                       Petitioner,

        -vs-

ADA PEREZ, Superintendent,
Bedford Hills Correctional Facility,

                   Respondent.
_____

**DECISION AND ORDER**
**No. 05-CV-0167(VEB)**

## I.      Introduction

*Pro se* petitioner Patrice Smith ("Smith" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Smith challenges the legality of her state-court custody pursuant to a judgment of conviction entered against her following a jury trial in Erie County Court, New York State Supreme Court, convicting her of intentional murder, felony murder, and first degree robbery.

The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

The acts upon which Smith's conviction is based occurred when Smith was 16 years-old. The victim was a 71-year-old man, Reverend Robert Robinson ("Robinson" or "the victim" or "the decedent") with whom Smith had been involved an eight-month sexual relationship that began when she was 15 years-old. The indictment charged Smith and her friend, "Theoplish" [sic] a/k/a "Laurentz" Mitchell ("Mitchell" or "co-defendant"), with strangling and beating the

victim to death at his house and stealing his car. Smith's co-defendant was tried separately.[1] The evidence presented by the prosecution at Smith's trial included Smith's statement that the victim gave her money and gifts in return for sexual favors.

At trial, Smith testified that she first met Robinson when he stopped to help her and her friends when they were having car trouble. Smith told him that she was 18 years old; she did not know how old he was the thought he appeared to be about 45 or 50. Robinson took her out to eat on several occasions. Eventually he asked if she had a boyfriend and said he wanted to get to know her better. T.856.[2] Robinson would take her to the mall and get her money to buy things. They started talking to each other every day. He used to tell her that she was so "tender" because she was so young and one day he asked if he could touch her sexually; she refused. T.859. A couple weeks later they were driving around in his car and he took her to an old train station and told her that he would give her $50 if she let him touch her. T.860. She let him, and then he masturbated; after he was finished he gave her $50 and drove her home. The same thing happened a couple days later. During her testimony regarding the sexual incident at the train station, Smith began crying, T.950, and explained on cross-examination it was because she "was ashamed[.]" T.950. Several weeks later Robinson offered her $100 if she would have sexual intercourse with him. T.861. He brought her to his house and told her to perform oral sex on him, and she did so reluctantly. He paid her $100.  Smith said that Robinson would buy her whatever

---

[1]     Although Mitchell initially pled not guilty, the Court cannot determine whether her case was disposed of through a guilty plea or at trial. There are no reported decisions regarding any appeal by Mitchell, suggesting that she pled guilty and waived her right to appeal. The Court did learn, through New York State Department of Corrections' "Inmate Locator" service, that Mitchell is currently incarcerated pursuant to a judgment of conviction for one count of first degree manslaughter, a class B felony. Her earliest release date is in April 2013.

[2]     Citations to "T.___" refer to pages from the transcript of Smith's trial.

she wanted from the liquor store so she "could be drunk whenever he asked [her] to do [it]." T.862. Robinson also used to purchase marijuana for her. T.863-64. Robinson himself did not use drugs or drink alcohol, however.

Smith testified that Robinson gave her money "most" of the times she performed some sort of sexual act with him. T.864. Robinson gave her his wristwatch and bought her a new one after she lost it, bought her school clothes, jewelry, sneakers and boots, a television set, and a phone; "practically whatever [she] wanted" he bought her. T.878. In June of 1998, Robinson told her that if she "could have his baby he would buy [her] a house." T.879. Robinson also promised that if she got her driver's license than she could have his other car, also a Cadillac.

Smith testified that Robinson was interested in having sex with other young women and in finding a sexual partner for Robinson's best friend, James Smith. Petitioner recalled a conversation in which Robinson asked her if she "could find James a friend," a young woman like petitioner. T.866. Robinson wanted petitioner to have sex with both him and his friend. T.866-67. Robinson also suggested that petitioner and her best friend get together with him and put on a "sex show" for him, and he once asked Smith to get him a "white girl." T.867. When Robinson would come to pick her up he would say to just bring her friends in the car with them. Petitioner identified several girls, including Martricia Gaskin and co-defendant Mitchell who had "been in his car." Smith testified that Gaskin or Mitchell were always with her when she would be driving around with Robinson. According to Smith, Robinson would let her friends know of his sexual interest by asking some of the girls to get out of the car, leaving him alone with another girl. T.868-69, 870.

Petitioner testified that about one time that he had sex with her against her will. One night

she had gone over there because she was so drunk and she did not want to go back to her own house. T.883. Robinson said that he wanted to have sex with her and she told him no because she was so sick. She passed out and when she woke up he was between her legs with his penis in her vagina. T.883-84. She told him to get off her because she was going to vomit and ran to the bathroom. T.884.

Petitioner related that she currently lived with her father, and that she tried to keep her relationship with Robinson secret from him. She went to go live with her father because her mother had thrown her out of the house. Petitioner stated that while she was living at her mother's house, her brother had raped her. T.885. Petitioner's brother continued to live with her mother after Petitioner left.

On the night of the incident, Petitioner testified, she and Mitchell were "bored" so she called Robinson to see if they could come over to his house. T.879-80. They took the bus to Robinson's house, arriving about 8 p.m. Mitchell brought along her four-month-old baby. They all watched television in the front room for about half an hour. Then Robinson went into the back, where his bedroom was, and told Smith that he wanted to have sex with her there. T.880-81. Robinson told her, "don't forget who be [sic] buying all [her] stuff." T.881. Smith acknowledged his generosity but said she did not want to have sex with him that night. According to Smith, Robinson started "getting all mad about it, telling [her] [she] need[s] to pay him back for everything that he's getting [her]." T.881. Smith replied that she would pay him back when she got a job.

At that point, Robinson left the room to admonish Mitchell to stop looking through some family mementos or photographs. When Smith followed behind him, Robinson asked her where

she was going. Smith testified that he then "slapped [her] right across [her] face" and ordered her to go back to his room. T.881.  On cross-examination, she claimed it was a "back hand" slap on right side of her face. T.971-72. Robinson tried to push her into the back room as she was trying to get to the front of the house to get away from him. (Smith said that she would not have been able to get out of the house even if she had tried because Robinson had so many locks on his doors; one could not exit the house without the right keys. T.886. )

Smith related that she and Robinson started fighting and Robinson threatened that he was going to get his gun. Robinson previously had told her that he slept with a gun under his pillow because he had been robbed once. Smith stated that he actually had shown her the gun. T.882. Smith was "scared" and she did not want him to get to the back room because she believed that was where the gun was located. As they were fighting in the hallway, Robinson, who was slightly smaller than she, fell down with her on top of him.

After Robinson fell on the floor, as he was trying to push Smith off of him, he announced that he was going to kill her. Smith explained,  "I was real scared that he was going to go get his gun, and the cord was like right there, and I swear I didn't mean to put it around his neck . . . ." T.885-86, 887. Smith testified on cross-examination that she did not how she "got [the cord], but it was in [her] hands." T.989, *see also* T.990-91. Smith said that she did not mean for the cord to become  wrapped around Robinson's neck; however, she "just started pulling it" while they were "still fighting" and he was still trying to get up.  Smith testified that she was thinking, "I don't want my life to be taken just because I didn't want to have sex with this man." T.890.

As Petitioner was pulling on the cord around Robinson's neck, Mitchell put a pillow over his head. Smith let go of the cord and "somebody [sic] grabbed a hold of the cord, and after that

we just left." T.888. Smith said that Mitchell held the pillow over his head until she (Smith) let go of the cord and then Mitchell grabbed onto the cord and started strangling him. T.888; *see also* T.997. Eventually, Smith testified, she saw blood coming through the pillow, although she told the police that she saw blood coming out of Robinson's mouth. T.1004. Smith testified on cross-examination that she got up and walked away from Robinson, to the front room, and Mitchell grabbed the cord and started pulling on it. T.997. At that point, Smith claimed, she told Mitchell to get up so they could leave. *Id.* Smith claimed that Robinson was not dead or unconscious when they left him lying in the hallway, although she admitted that she never saw him move or get up. T.1033.

Before Smith left the house, she took the keys to Robinson's blue Cadillac and went into the garage with Mitchell and her baby. T.1004. Smith testified that she put the baby in the car and Mitchell was driving. However, in her statement to the police, Smith said it was she who pulled the car out of the driveway. T.1008. Smith testified that Mitchell parked the Cadillac on Davidson Street, which was just around the corner from Smith's house. T.1024. Smith said that she did not intend to "steal" Robinson's car but she just did not want to be at his house any longer and taking the car was the quickest way to get away. T.890, 1024.

Once they were back at Smith's house, Smith and Mitchell found their friends Ronnie Goosby and Randy Winston still hanging out there. It was about 10 p.m. T.209. The four of them sat around and played cards and watched television. *E.g.*, T.210. When the story regarding Robinson's homicide appeared as "breaking news" on the 11 p.m. news broadcast, Mitchell turned the T.V. off. T.1025.

Smith testified that she did not take anything from Robinson nor did she see Mitchell take

anything from him. T.889. In her police statement, however, she explained that Mitchell went through the decedent's pockets and took his wallet, containing $20. Smith denied that she and Mitchell ransacked the house and claimed she did not know how it got to be in such disarray. 891.

Smith's friend, Ronnie Goosby, had known her for between four and six years and used to spend time at her house on Millicent Avenue "[a]bout everyday." T.203. He had known Mitchell for about a year and a half, and had had a sexual relationship with her. T.204, 225. According to Goosby, when the news came on the television, Petitioner and Mitchell wanted to stop playing cards so they could watch the news. T.211. When the story aired about a resident on Hamlin Road getting beaten and killed, Mitchell got up and turned off the television set. T.211-12. Goosy then asked Mitchell and Petitioner what had happened. T.212. Petitioner said that they "had went [sic] over there to rob the Reverend and they beat him up, and they thought they beat him up . . . ." T.212. Petitioner explained that Mitchell distracted Robinson while Petitioner put the phone cord around his neck. T.213. Petitioner said that "[w]hile she was choking [him] they seen [sic] blood come out of his mouth and that's when they [i.e., Mitchell] put the pillow over his face." T.213. Petitioner told him that they were looking for money and that Mitchell "was ransacking th[e] house." T.214. Goosby recalled that once Petitioner arrived home, she had keys to the Cadillac and $20 in her hand. T.215. Petitioner changed the clothes she had been wearing. T.214. She told Goosby that they had parked Robinson's car around the corner from her house. T.216.

After the news broadcast, Petitioner appeared to Goosby to be "[s]cared." T.216. She asked him to be her alibi. T.216-17. Goosby said "no" because he did not want to be involved.

T.217. He and Winston left Smith's house, and went over to the convenience store to call a cab for Smith and Mitchell. Winston provided testimony that was consistent with that provided by Goosby. *See* T.249-50, 263-64, 272-73. About half and hour later, Petitioner and co-defendant Mitchell asked Goosby to call them a taxicab; they then left and went over to Mitchell's house. T.217-19, 274-75, 379-80. Winston testified similarly that Petitioner admitted to him that she and Mitchell beat the decedent and that she choked the decedent with a telephone cord. T.266-73. Petitioner also asked Winston to be her alibi, but he refused. T.275.

The decedent's body was discovered by his daughter, Anita Ortiz ("Ortiz"), at about 10:15 p.m. that night. He was found lying on his back in a pool of blood, in the sitting room. Drawers had been opened in the bedrooms and various items were strewn about. Ortiz noticed that her father's watch, as well as his car keys and car, were missing. T.97-98, 105-07, 111-12, 130-33, 162.

About a week after the incident, Smith was brought to the police station for questioning. In her first statement, she denied involvement in the homicide. In her second statement, *see* T.438-42, Petitioner stated that her co-defendant, Mitchell, had told her that she (Mitchell) was going to rob the victim. After Petitioner and Mitchell arrived at the victim's house, the victim threatened to shoot and kill Petitioner with his gun. A struggle ensued in which Petitioner ended up with a telephone cord in her hands which got wrapped around the victim's neck. Petitioner told the police that the victim fell and hit his head. Petitioner was holding onto the cord when she saw that the victim was coughing up blood. Co-defendant Mitchell then put a pillow over the victim's face, and Petitioner let go of the cord. They both got up, grabbed the victim's car keys, and left the house. Petitioner said in her second statement that the victim was still breathing when

they left and that she had not meant to do it. According to Petitioner, co-defendant Mitchell took some cash from the victim's pocket. Petitioner and Mitchell got into the victim's blue Cadillac, and Petitioner drove the car over to Davidson Street and parked it, and then they returned to Petitioner's house on Millicent Avenue.

The prosecution called as a witness an inmate named Norma Williams ("William"), a long-time crack addict who had been housed with Petitioner prior to trial. The inmate testified that Petitioner told her "that she [Petitioner] had committed a murder with [sic] a guy she used to date and she committed murder because the guy failed to give her some money." T.467, 468.. According to Williams, Petitioner explained that "[h]er [sic] and her partner had commenced to beat the guy and then strangled the guy." T.467. Petitioner told Williams that she had used a telephone cord to strangle the victim. T.467. After the murder, Petitioner said, she and her partner rode around Buffalo in the car of "the guy who got killed[.]" T.468. Williams testified that Petitioner had mentioned that "her friend's baby was present" at the time of the murder. T.468.

The prosecutor's theory of motive was that Smith went over to Robinson's house on the night of the murder in order to steal money from him so that she could retain an attorney to represent her in connection with a weapons-possession charge then pending in Buffalo City Court. T.61-62, 1163, 1186-87. Apparently, Smith did not qualify for *pro bono* representation due to her father's income level, and her father was unwilling to put forward a retainer fee for an attorney. The prosecution called a friend of Petitioner's, Martricia Gaskin ("Gaskin"), who testified that a few months before the homicide, Petitioner had asked to go over to Robinson's house and "distract the minister" while Petitioner stole money from him. T.494-95. Gaskin

understood that Petitioner was referring to Robinson, the decedent. T.495. Gaskin testified that Petitioner claimed to know where Robinson kept his cash secreted in his house. *See* T.494-95.

The county medical examiner testified that the cause of death was ligature strangulation. T.644. He opined that significant force would have had to have been used, and that death would have occurred in one to five minutes. T.643, 653, 682.

The trial court refused trial counsel's request to charge the defense of extreme emotional disturbance or "EED" but granted the request to issue two self-defense instructions. The jury rejected the defense theories of justification (self-defense), and returned a verdict finding Smith guilty as charged in the indictment of two counts of second degree murder (intentional and felony) and one count of first degree robbery.

Petitioner was sentenced on December 1, 1999, to indeterminate terms of imprisonment of twenty-five years to life for the murder convictions, and a ten-year determinate term for the robbery conviction, all sentences to be served concurrently.

Smith appealed her conviction and on November 15, 2002, the intermediate state appellate court unanimously affirmed the judgment of conviction. *People v. Smith*, 299 A.D.2d 941 (N.Y. App. Div. 4th Dept. 2002). Leave to appeal was granted and on February 17, 2004, the New York Court of Appeals affirmed the Appellate Division's order. *People v. Smith*, 1 N.Y.3d 610 (N.Y. 2004).

Smith then collaterally attacked her conviction by means a motion for *vacatur* pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. While the C.P.L. § 440.10 motion was still pending in Erie County Court, Smith filed the instant habeas petition in this Court. The County Court has since issued a decision denying Smith's request for C.P.L. § 440.10 relief.

Smith states that she "is raising the same grounds that she raised on direct appeal and her 440.30 [sic] motion," Petition, ¶12(a) (Docket No. 1), and has attached copies of her appellate brief, C.P.L. § 440.10 motion, and pages from the trial transcript relevant to her claims. All of the grounds raised in Smith's Petition appear to this Court to be fully exhausted, either by presentation to the state court on direct appeal or in the C.P.L. § 440.10 motion. For the reasons that follow, Smith request for a writ of habeas corpus is denied, and the petition is dismissed.

## III.    General Legal Principles Applicable to Federal Review of § 2254 Petitions

Under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Because Petitioner filed her habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), the petition is governed by 28 U.S.C. § 2254, as amended. *See Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000). The AEDPA provides that a federal court may not issue a writ of habeas corpus with respect to a claim that was adjudicated on the merits by the state courts "unless the adjudication of the claim 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1), (2). A

state adjudicates a petitioner's federal claim on the merits when "it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

When a state court has expressly relied on a procedural default as an independent and adequate state ground a federal habeas court is foreclosed from reviewing the claim. *Harris v. Reed*, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (federal habeas court cannot review a claim if a state court explicitly invoked a state procedural bar rule as a separate basis for decision). This is the case even where the state court has also ruled in the alternative on the merits of a federal claim. *Velasquez v. Leonardo*, 898 F.2d at 9; *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir.1996), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997).

## IV.     Analysis of the Petition

### A.     Deprivation of Sixth and Fourteenth Amendment Rights to Present a Defense: The Trial Court's Preclusion of Evidence Regarding "Extreme Emotional Disturbance"

#### 1.     The Constitutional Right to Present a Defense

The Compulsory Process Clause of the Sixth Amendment to the Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Supreme Court has explained that "[t]he right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact[,]" and thus "[t]he right to offer testimony is . . . grounded in the Sixth Amendment even though it is not expressly described in so many words." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). In *Washington*, the

Supreme Court articulated that the right to compel a witness' testimony, without a concomitant guarantee of being able to introduce that witness' testimony, would render illusory the right to present a defense:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. at 19; *accord Taylor v. Illinois*, 484 U.S. at 409; *Pullinario v. Goord*, 118 Fed.Appx. 554, *556, 2004 WL 2980384, **1 (2d Cir. Dec. 23, 2004) (unpublished opn.).

However, a defendant's constitutional right to present evidence is not absolute, and she may be precluded from presenting evidence as a sanction for defense counsel's willful violation of a discovery rule or order, *see Taylor v. Illinois*, 484 U.S. 400, 414 (1988). In *Taylor*, the Supreme Court recognized that a defendant's right to present witnesses in her defense is not absolute: "Petitioner's claim that the Sixth Amendment creates an absolute bar to the preclusion of the testimony of a surprise witness is just as extreme and just as unacceptable as the State's position that the Amendment is simply irrelevant. The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." 484 U.S. at 410. In certain circumstances, the *Taylor* court found, the preclusion of a defense witness' testimony does not violate the Sixth Amendment, such as when it is employed as a sanction for misconduct that was "willful and motivated by a desire to obtain a tactical

advantage [so as to] . . . minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." 484 U.S. at 415.[3] ; in this case, the discovery rule at issue is C.P.L. § 250.10.[4]

### 2. The New York State Law Partial Affirmative Defense of "Extreme Emotional Disturbance" ("EED")

"The EED defense is available to an individual whose mental state does not rise to the level of 'insanity,' but who "'is exposed to an extremely unusual and overwhelming stress,' and 'has an extreme emotional reaction to it as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.'" *Deluca v. Lord*, 858 F. Supp. 1330, 1347 n.15 (S.D.N.Y. 1994) (quoting *People v. Shelton*, 88 Misc.2d 136, 385 N.Y.S.2d 708, 717 (N.Y. Sup. Ct. 1976). EED is a partial affirmative defense[5]

The EED defense consists of both a subjective and an objective element:

---

[3]    The Supreme Court held that the circumstances in *Taylor* justified preclusion of the witness' testimony because defense counsel's failure to notice an eleventh-hour alibi witness was "willful and blatant"; "the inference that [the defendant] was deliberately seeking a tactical advantage [was] inescapable"; and "the court . . . ha[d] a vital interest in protecting the trial process from the pollution of perjured testimony." 484 U.S. at 416-17.

[4]    Even before *Taylor*, New York courts, both State and Federal, have recognized that "[b]ecause precluding evidence as a sanction for failure to give notice implicates a defendant's Sixth and Fourteenth Amendment rights, a trial court deciding whether to bar psychiatric testimony must balance 'a defendant's constitutional right to present witnesses in his own defense' against 'prejudice to the People from the belated notice.'" *Romano v. Zon*, No. 04-CV-2467 NG LB, 2007 WL 2693664, at *6 (E.D.N.Y. Sept. 10, 2007) (quoting *People v. Berk*, 88 N.Y.2d at 266, 644 N.Y.S.2d at 662) (citing U.S. Const. 6th, 14th Amends; *Ronson*, 463 F. Supp. at 102-03 (" Indeed, without deciding the question, the Supreme Court stated in the context of a state notice of alibi statute that the extent to which a state may exclude relevant and probative evidence as a sanction for failure to comply with such a [notice] requirement does raise Sixth Amendment issues.") (citing *Williams v. Florida*, 399 U.S. 78, 83 n. 14, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)). Respondent does not argue that Smith's claim regarding the preclusion of evidence pertaining to the EED defense raises only an issue of State law.

[5]    In comparison, justification or self-defense "is an ordinary defense rather than an affirmative one. . . . As such, whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged." *People v. McManus*, 67 N.Y.2d 541, 546-47, 505 N.Y.S.2d 43, 46, 496 N.E.2d 202 (N.Y. 1986).

The first, subjective element is met if there is evidence that defendant's conduct at the time of the incident was actually influenced by an extreme emotional disturbance. The second is an objective element and requires proof that defendant's emotional disturbance was supported by a reasonable explanation or excuse. This is determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for the emotional disturbance was reasonable.

*Murden v. Artuz*, 497 F.3d 178, 195 (2d Cir. 2007) (quoting *People v. Roche*, 98 N.Y.2d 70, 76, 745 N.Y.S.2d 775, 780, 772 N.E.2d 1133, 1138 (2002)), *cert denied sub nom. Murden v. Ercole*, 552 U.S. 1150, 128 S.Ct. 1083, 169 L.Ed.2d 823 (2008)). The subjective element requires "a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self control." *Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138; *see People v. Matthews*, 220 A.D.2d 822, 825, 632 N.Y.S.2d 298, 300 (N.Y. App. Div. 3d Dept.1995) ("However, there is no reasonable view of the evidence to support the conclusion . . . that defendant acted with the characteristic loss of complete control associated with this defense[.]) (citations omitted).[6]

The affirmative defense of extreme emotional disturbance is addressed in N.Y. Penal Law § 125.25(1)(a) and § 125.20(2), which define the elements of murder in the second degree and

---

[6]    The EED defense may be invoked in cases involving "mental trauma" or "mental infirmit[y]" that does not rise to the level of insanity. *People v. Casassa*, 49 N.Y.2d 668, 677, 427 N.Y.S.2d 769, 404 N.E.2d 1310, *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 50 (1980). *See also DeLuca v. Lord*, 77 F.3d 578, 584-85 (2d Cir.) (collecting New York authorities), *cert. denied*, 519 U.S. 824, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996). Although the prosecution typically bears the burden of disproving a defense, *see* N.Y. PENAL LAW § 25.00(1), EED is an "affirmative defense" which a defendant has the burden proving by a preponderance of the evidence. N.Y. PENAL LAW § 25.00[2]. The United State Supreme Court has rejected a constitutional challenge to precisely this burden-assignment scheme. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (holding that the New York statute assigning to the accused the burden of proving EED did not violate due process protections)

manslaughter in the first degree. Read in tandem, these statutes provide that a defendant who proves by a preponderance of the evidence that he or she committed a homicide while "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse" is guilty of manslaughter and not murder. *People v. Roche*, 98 N.Y.2d 70, 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133 (N.Y.2002). The effect of a successful EED defense does not lead to acquittal, but reduces the crime upon conviction from murder to manslaughter in the first degree. N.Y. Penal Law § 125.25(1)(a); *see also People v. Casassa*, 427 N.Y.S.2d at 772-73, 404 N.E.2d 1310; *DeLuca v. Lord*, 77 F.3d at 585. Thus, under New York law, "extreme emotional disturbance for which there was a reasonable explanation or excuse" is a partial affirmative defense to murder in the second degree. *See* N.Y. PENAL LAW § 125.25(1)(a). The EED defense "'defense allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although [ ] not free from responsibility for [the] crime, [defendant] ought to be punished less severely[.]'" *Id.* (quoting *People v. Casassa*, 49 N.Y.2d at 675, 427 N.Y.S.2d 769, 404 N.E.2d 1310).

The "reasonableness" of the explanation or excuse for the EED "is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." *Id.* "A defendant cannot establish an extreme emotional disturbance defense without evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide.[.]" *People v. Roche*, 98 N.Y.2d 70, 75 (N.Y. 2002). The defense of extreme emotional disturbance requires the defendant to produce "evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-control." *People v. Smith*, 1 N.Y.3d 610, 776 N.Y.S.2d 198,

199, 808 N.E.2d 333 (N.Y.2004) (emphasis supplied); *see also People v. White*, 79 N.Y.2d at 904, 581 N.Y.S.2d 651, 590 N.E.2d 236. This is the EED defense's subjective element, which "focuses on the defendant's state of mind" and is "generally associated with a loss of self-control." *People v. Harris*, 717 N.Y.S.2d 82, 740 N.E.2d at 229; *see also Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133.

Notably, "[p]sychiatric evidence is not necessary to establish the [EED] defense." *People v. Moye*, 66 N.Y.2d at 890, 498 N.Y.S.2d 767, 489 N.E.2d 736 (citing *Matter of Lee v. County Ct.*, 27 N.Y.2d 432, 442, 318 N.Y.S.2d 705, 267 N.E.2d 452).  Such testimony is not "essential or controlling, and the trier of fact may reject the defense even where the prosecution offers no expert testimony to rebut it." *People v. Shelton*, 88 Misc.2d 136, 145, 385 N.Y.S.2d 708, 715 (N.Y.Sup.Ct.1976) (citing *People v. Solari*, 43 A.D.2d 610, 349 N.Y.S.2d 31 (App.Div.3d Dept.1973), *aff'd*, 35 N.Y.2d 876, 363 N.Y.S.2d 953, 323 N.E.2d 191 (N.Y.1974); *People v. Patterson*, 383 N.Y.S.2d at 582, 347 N.E.2d 898).

### 3.   C.P.L. § 250.10(2), a New York State Discovery Rule Applicable in EED Cases

"Under CPL 250.10(2), a defendant is precluded from raising any defense predicated on a mental infirmity, including extreme emotional disturbance, if the defendant fails to file and serve a timely notice of intent to present psychiatric evidence." *People v. Diaz*, __ N.E.2d ___, 2010 N.Y. Slip Op. 04830,  2010 WL 2265033, at *--- (N.Y. June 8, 2010).  The trial court "possesses broad discretion, however, to grant permission to submit a late notice in the interest of justice at any time prior to the close of evidence[.]" *Id.* (citing N.Y. CRIM. PROC. LAW § 250.10(2)). When notice is given under C.P.L. § 250.10(2), the prosecution may apply to the trial judge for an order

directing the defendant to submit to an examination by a psychiatrist selected by the prosecution. N.Y. CRIM. PROC. LAW § 250.10(3)). The purpose of the C.P.L. § 250.10 notice provision is to "prevent disadvantage to the prosecution as a result of surprise." *People v. Berk*. 88 N.Y.2d 257, 263, 644 N.Y.S.2d 658, 661 (N.Y. 1996) (quoting *Ronson v. Commissioner of Correction*, 463 F. Supp. 97, 103 (S.D.N.Y. 1978), *aff'd*, 604 F.2d 176 (2d Cir. 1979)). "Finally, preclusion may be an appropriate sanction when a defendant has deliberately failed to file notice until after the statutory period has run." *Ronson*, 463 F. Supp. at 104 (holding that total preclusion unwarranted "Under the unusual circumstances of this case, in which both sides experienced substantial delay in securing evidence with regard to an insanity defense, a continuance[7] would have provided the State with sufficient opportunity to obtain evidence to refute the defense" and We do not find that Ronson deliberately refrained from filing notice. Moreover, even though the evidence falls short of establishing that the prosecution had actual notice, we credit defense counsel's statements at the habeas hearing that he believed that his efforts were sufficient to notify the Assistant District Attorney that the defense would be raised at the second trial). The New York Court of Appeals has held that "[t]he trial court is granted broad discretion in making evidentiary rulings in connection with the preclusion or admission of testimony and such rulings should not be disturbed absent an abuse of discretion." *People v. Almonor*, 93 N.Y.2d at 583, 693 N.Y.S.2d

---

[7]     The Court questions whether defense counsel wanted a continuance in this case. Indeed, it seems to have been of paramount importance to defense counsel to avoid having Petitioner undergo a psychiatric evaluation by an expert selected by the prosecutor. "Once such notice [under C.P.L. § 250.10(2)] is served, the People have the right to an examination of the defendant by a psychiatrist or a psychologist." *People v. Smith*, 1 N.Y.3d at 612.

at 869 (quoted in *Romano v. Zon*).[8]

### 4. Overview of the Preclusion Issue at Trial

Before the trial commenced defense counsel made several evidentiary requests. First, counsel asked to subpoena surrogate court records of the victim's wife, who had pre-deceased him. T.12-13. Defense counsel observed that the wife had not left anything to Robinson in her will, and that he had "found out other matters that raise a lot of questions as to the past conduct of the Reverend [Robinson]." T.15. The trial court inquired as "how the past conduct of the deceased" would "provide a defense of any kind[.]" T.15. Defense counsel explained that he was going to "try and elicit" that after his wife died, Robinson was "very interested in sex to what might be described as excess," and that his wife had changed her will because "she had found out about a sexual relationship that he [the victim] was having with one of their foster children[.]" T.15. The trial judge reserved decision, noting, "[i]t seems like that's well beyond this case." T.16.

Several days later, just prior to opening statements, defense counsel made additional argument regarding the surrogate court records, stating that they were pertinent to the three possible defenses: "self-defense, defense from being raped or sodomized, and the defense of extreme emotional disturbance." T.40. That was the first time defense counsel had mentioned the

---

[8]     In *People v. Almonor*, the New York Court of Appeals upheld the trial court's preclusion of psychiatric evidence regarding lack of intent where the defense failed to timely identify the subsection of C.P.L. § 250.10(1) under which it intended to proceed, holding that the trial court had acted within its discretion. *Almonor*, 93 N.Y.2d at 581, 693 N.Y.S.2d at 868. The New York Court of Appeals noted that C.P.L. § 250.10 "contemplates and mandates preclusion for failure of compliance[,]" and "is not cast so as to allow a defense or affirmative defense to be introduced when notice is given;" rather, "it is cast in terms that bar the defense unless notice is given." *Id. See also Almonor v. Keane*, 27 Fed.Appx. 10, No. 01-2100, 2001 WL 1168341 (2d Cir. Sep. 21, 2001) (upholding the district court's denial of Almonor's federal habeas corpus petition because "the decision of the state trial court to bar the additional psychiatric testimony did not, in the circumstances of the instant case, violate Almonor's federal constitutional rights") (unpublished opinion).

EED defense. The prosecutor asserted that he "need[ed] a notice under the law[,]" i.e., The prosecutor objected to the EED defense on the ground that he had not received notice under C.P.L. § 250.10(2). N.Y. Crim. Proc. Law § 250.10(2) ("Psychiatric evidence is not admissible upon a trial unless the defendant serves upon the people and files with the court a written notice of his intention to present psychiatric evidence. . . .").[9] The trial judge commented, "You need to have notice of these [defenses]. I don't see how those would come in." T.40. The following brief colloquy occurred:

| [Defense counsel]: | Well, I don't agree that a notice is required, and I've seen a case where it [the EED defense] doesn't require psychiatric testimony. I've got it in my research and that to be raised from the testimony at trial, if it's official, and if the Defendant, say, has information that the victim is a rapist or raped somebody or is a sex addict, I think that's admissible under that defense. |
|---|---|
| The Court: | It's denied at this point. If something develops in the trial and in my mind I'll re-look at that, but at this point the fact that the deceased may have had relationships with other girls or other women separate from this Defendant is irrelevant.[10] But if that changes and I feel that the charge is |

---

[9]     C.P.L. § 250.10 defines "the term 'psychiatric evidence' [to] mean[ ]:

(a) Evidence of mental disease or defect to be offered by the defendant in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect.
(b) Evidence of mental disease or defect to be offered by the defendant in connection with the affirmative defense of extreme emotional disturbance as defined in paragraph (a) of subdivision one of section 125.25 of the penal law and paragraph (a) of subdivision two of section 125.27 of the penal law.
(c) Evidence of mental disease or defect to be offered by the defendant in connection with any other defense not specified in the preceding paragraphs."

N.Y. Crim. Proc. Law § 250.10(1)(a)-(c).

[10]     The defense called Petitioner's friend, Martricia Gaskin ("Gaskin"), who testified that she knew that Petitioner was having sex with the decedent, that the decedent gave Petitioner gifts and money, and that the decedent had asked Gaskin to go out with him. T.1036-37. The trial court sustained the prosecutor's objection to defense counsel's inquiry of Gaskin as to whether the decedent knew Petitioner was not eighteen years-old and whether the decedent had asked anybody to "set him up with young girls." T.1037-38.

based on what we put on, I'll reconsider.

T.40-41. Thus, based upon defense counsel's evidentiary proffer, the trial court denied

admission of the evidence regarding the victim's alleged past sexual conduct, but stated that the

issue could be reconsidered depending on what developed during the trial. *See* T.40-41.

During petitioner's direct testimony, defense counsel revisited the notice issue, stating

that since he was offering no psychiatric evidence, there was no prejudice to the District Attorney

by the lack of notice. The court responded that if the defendant testified as to her thoughts or why

she did something, it would be "psychiatric" testimony, albeit not by an expert, and therefore

notice was required. Defense counsel then stated "I believe that we're entitled to raise this

defense [of EED]. Whether or not you decide to charge it is another question." The trial judge

responded, "Well, that's true. I'll give you some leeway as far as her taking the stand, I think I

have to." T.870-72.

After calling his last witness, defense counsel asserted that the court had foreclosed him

from "calling certain witnesses and going into certain areas . . . connected to . . . [the decedent's]

background, his sexual tactics, his wanting to and having sex with other persons." T.1049.

Defense counsel explained that he wanted to "really bring out the defense position that [the

decedent] was a child molester[,]" and that "such material would be admissible as to the

presentation of a rape defense [sic], possibly self-defense, but also the[11] [sic] defense." T.1049.

Defense counsel continued to assert no notice under C.P.L. § 250.10(2) was required because he

"did not elicit from the Defendant or anyone else" and would not elicit from any other witness,

---

[11]     Trial counsel most likely said "the *EED* defense" but presumably the "EED" was not picked up by
the court reporter.

that Smith "had any mental problems" or "any mental diseases". T.1050. That "no psychiatric

evidence" was being offered allowed the defense "to avoid any notice requirement[,]" according

to trial counsel. T.1050. In the alternative, counsel requested permission to file a late notice under

C.P.L. § 250.10(3), which, as he noted, he was statutorily permitted to do because the proofs had

not been closed. *Id.* Defense counsel asserted that if a late filing was permitted, the prosecutor

could not ask for a psychiatric examination of Petitioner "to counter psychiatric evidence or

testimony[,]" " because there is none and there will be none[.]" Counsel asserted that he had no

expert witness, such as a psychiatrist or psychologist, that he intended to call. T.1050-51.

The prosecutor reiterated his objection that the notice requirement had not been met,

argued that under *People v. Berk* and *People v. Pitts*, C.P.L. § 250.10 should be interpreted

broadly to refer to "any evidence of any psychiatric condition" and not just "expert testimony[.]"

T.1051. The prosecutor argued that defense should not be permitted to "get around the notice

requirement by sneaking [psychiatric evidence] in through the Defendant[.]" The prosecutor

claimed prejudice because Petitioner had not been examined by a psychiatric expert selected by

the prosecution. T.1051.[12]

The prosecutor noted that he had raised his objections regarding the lack of notice on

three occasions so far, and since the trial court had actually let the information come in by way of

the Petitioner's testimony, the parties really were at the point of arguing whether the jury would

be charged with the EED defense. T.1051-52. The prosecutor reiterated his objection as to the

lack of notice, noting that they were three weeks into trial, and it was "just too late" for the

---

[12]     After a defendant serves notice under C.P.L. § 250.10(2), the prosecutor can move the trial court
to order the defendant to undergo a psychiatric examination by an expert witness selected by the prosecutor.

defense to ask for an adjournment in order to have Petitioner examined by a prosecution expert.

T.1052.

The trial court ruled as follows:

[A]s far as the extreme emotional disturbance defense, without psychiatric testimony, again, and I indicated this yesterday, that's certainly permissible, but it doesn't change the notice requirement [in C.P.L. § 250.10(2)]. I think the notice requirement is very clear and there's never been notice of EED. As far as the request to file a notice now, it's much too late in the game for that, and as far as the Court letting in a lot of the evidence which I did concerning the sexual relationship between the Defendant and the deceased, I let that in in part because some of that will relate to a self-defense charge if you request it, and that's why I let some of it in. . . ."

T.1052-53. Thus, the trial court precluded any evidence to be admitted to the extent it was probative of an EED defense.

As noted above, defense counsel wanted to subpoena the records from the probate proceedings of the decedent and his late wife for purpose of showing the alleged sexual proclivities of the decedent as they related to individuals other than Petitioner. As the trial court correctly noted earlier, there was no showing of the relevance these documents had to Petitioner's trial. Accordingly, their admission was properly refused on grounds of irrelevancy. Defense counsel also wanted to use Petitioner's own testimony regarding her sexual relationship with the decedent, and what she knew of the decedent's sexual relationships with other individuals, in support of the EED defense. Here, the trial court did provide defense counsel "leeway" in the subject-matter of Petitioner's testimony, allowing her to testify at length regarding her sexual relationship with the decedent, his unconventional, and some would say, perverted sexual proclivities, the demands that he made upon her, that he bought her alcohol and wanted her to be drunk during their sexual encounters, and her state of mind at the time of the

-23-

murder. In addition, defense counsel had elicited testimony from one of Petitioner's friends that the decedent had asked the friend out on a date. The foregoing evidence was pertinent to the EED defense, but the trial court indicated that the only reasons that she was allowing it was because it also was relevant to the justification (self-defense) defense, which did not require advance notice. The net effect of the trial judge's ruling that the lack of C.P.L. § 250.10(2) notice required preclusion, and the denial of the EED jury instruction, was to deny Petitioner the opportunity to present the defense of extreme emotional disturbance as an alternative, yet not inconsistent defense. *See Lopez v. Ercole*, No. 09CIV.1398PACAJP, 2010 WL 1628994, at *30 (S.D.N.Y. Apr. 21, 2010) ("Thus, the justification defense was not a better defense than the EED defense (which, in any event, could have been raised along with a justification defense.").

On direct appeal, the Appellate Division declined to decide whether the trial court properly applied C.P.L. § 250.10(2) to the non-expert testimony that defense counsel sought to introduce. Instead, it held that Smith was not entitled to a jury charge on EED based solely on trial counsel's assertion, in an attempt to persuade the trial court that no notice was required, that Smith was suffering from a "mental disease or defect." Thus, the Appellate Division found, it made no difference whether the evidence to support the defense was properly excluded or not. Accordingly, the Appellate Division ruled that it "need not decide whether notice pursuant to CPL 250.10(2) is required for mental health testimony by non-experts." *People v. Smith*,  299 A.D.2d at 942, 750 N.Y.S.2d at 731.

Although the statement by trial counsel to the effect that Smith was not suffering from a mental disease or defect was inartful, this Court believes that the Appellate Division elevated form over substance so as to  misconstrue trial counsel's statement as negating his request for an

EED defense. This error was not repeated by the New York Court of Appeals when it affirmed the Appellate Division's order, however. Although the Court of Appeals also concluded that Smith was not entitled to an EED jury charge, its holding was based on a different rationale, as discussed further in this Decision and Order, *infra,* in the section regarding the failure to give the EED instruction. Because it rejected Smith's claim that an EED charge was warranted, the Court of Appeals similarly ruled it "need not decide whether pretrial notice of defendant's proffered testimony was required," *People v. Smith,* 1 N.Y.3d at 612, 808 N.E.2d at 334, because, as more fully discussed below, it found that there was insufficient evidence to support the defense, obviating the need for deciding that whether lay testimony concerning the EED defense required notice.

Since both the Appellate Division and New York Court of Appeals specifically declined to decide the issue of whether was properly precluded under C.P.L. § 250.10(2), the only court that adjudicated the claim on the merits was the County Court. Time has proven that the trial judge correctly construed C.P.L. § 250.10(2) as applying to lay evidence, such as a defendant's own testimony, offered in support of an EED defense: Recently, the New York Court of Appeals answered in the affirmative the question it explicitly left open in Smith's case–"whether a defendant seeking to raise an extreme emotional disturbance defense is required to provide notice pursuant to CPL 250.10 if the intent is to rely solely on lay testimony to prove the affirmative defense." *People v. Diaz*, 2010 WL 2265033, at *– (holding that in a second-degree murder prosecution, defendant was required to provide statutory notice of his intent to rely upon the affirmative defense of extreme emotional disturbance (EED), notwithstanding his stated intention to support that defense with lay testimony only; the notice requirement's goals of preventing

unfair surprise and allowing the prosecution an opportunity to obtain evidence from any source were implicated whether defendant sought to establish mental infirmity through expert or lay testimony).[13]

Because the sanction of preclusion bears on a defendant's constitutional right to present a defense, the New York Court of Appeals cautioned in *People v. Diaz* that trial courts must be vigilant in weighing a defendant's constitutional rights "'against the resultant prejudice to the People from the belated notice[.]'" *Id.* (quoting *Berk*, 88 N.Y.2d at 266, 644 N.Y.S.2d 658, 667 N.E.2d 308). Here, although the trial court was correct in finding that notice under C.P.L. § 250.10(2) was required if Petitioner wanted to present an EED defense based upon lay testimony, it did not perform the required balancing of prejudice to the prosecution against Petitioner's right to present a defense. This Court reads *Diaz* as a recommendation that courts employ preclusion sparingly, given the nature of the constitutional right at stake, *see Ronson v. Commissioner of Correction*, 604 F.2d 176, 178 (2d Cir. 1979), and also that prosecutors need to demonstrate that their cases are actually hindered by a defendant's late notice rather than simply asserting that prejudice flows automatically from a tardy assertion of the defense. The trial court simply agreed

_____

[13]    Its last pronouncement on C.P.L. § 250.10(2), *People v. Berk*, dealt with a defendant who sought to introduce testimony of a forensic psychologist–who had not examined him personally– regarding the general tenets of the "flight or fight syndrome." The New York Court of Appeals observed in *Berk* that "inasmuch as the notice provision was intended 'to allow the People an opportunity to obtain any mental health evidence necessary to refute a defense of mental infirmity, it follows that it applies to *any* mental health evidence to be offered by the defendant in connection with such a defense[.]'" ( id. at 265, 644 N.Y.S.2d 658, 667 N.E.2d 308 [emphasis in original] ). In *Diaz*, the defendant filed late notice of his intent to present his own testimony in support of an EED defense. The New York Court of Appeals determined that "[a]lthough *Berk* involved expert testimony, its reasoning applies equally to lay testimony proffered in connection with a mental infirmity defense." The notice provision in C.P.L. § 250.10, whose aims are "preventing unfair surprise and allowing the People an opportunity to obtain evidence from any source, expert or otherwise[,]" are "implicated whether a defendant seeks to establish a mental infirmity through expert or lay testimony, whether by the defendant or other persons, such as witnesses to the events related to the crimes charged." *Id.*  Consequently, for purposes C.P.L. § 250.10(2), "psychiatric evidence," which the court has "broadly construed to encompass 'any' mental health evidence offered by a defendant, includes lay testimony."

with the prosecutor that it was too late and did not give any real consideration to granting a continuance. To be fair, trial counsel did not specifically ask for permission to file late notice at that point. Indeed, he maintained that notice was simply not required. *See* T.40-41. Although the trial court believed it was already too late to even consider a continuance, this was the type of case "where a defendant plans to rely on lay testimony alone in support of a mental infirmity defense" and "the degree of prejudice to the prosecution . . . [might] be less significant . . . ." *People v. Diaz*, *supra*. Because trial courts "enjoy wide discretion in considering late notice, . . . and can adjourn proceedings to give the People time to gather rebuttal evidence," *id.*, this Court believes that the trial court here should have exercised its discretion to consider a continuance in this case, given the importance of the constitutional right at stake. "[S]tate preclusion rules may not be applied mechanically; rather 'a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify,' *Rock v. Arkansas*, 483 U.S. at 56, or 'to present witnesses in his own defense,' *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)." *Pulinario v. Goord*, 118 Fed. Appx. 554, 2004 WL 2980384, at **2 (2d Cir. Dec. 23, 2004) (affirming district court's grant of habeas corpus based upon prejudicial preclusion of evidence).

The Court believes that the trial court should have explored whether the prosecutor, based on defense counsel's evidentiary proffer, desired to have Petitioner examined by an expert; as *People v. Diaz* observed, the trial courts have the discretion to order a defendant asserting an EED defense to undergo a psychiatric examination. Given that the trial spanned at least three weeks, there was certainly sufficient time for the prosecutor to have Petitioner examined by a psychiatrist or psychologist. Because trial counsel insisted that even if late notice were granted,

the prosecution (1) still would not be able to have Petitioner examined by a psychiatrist and (2) was not prejudiced because the defense was not presenting "psychiatric" testimony, his litigation posture leads this Court to believe that he most likely would have elected to withdraw his request to present an EED defense in order to avoid having Petitioner examined by an expert selected by the prosecution. Thus, the Court believes that trial counsel's arguments in this regard reveal an element of gamesmanship. However, the Court does not find that there was "willful misconduct" on the part of the defense since at the time of Petitioner's trial, it was an open question of New York law whether C.P.L. § 250.10(2) notice was required where, as in Petitioner's case, the evidence to support the EED defense was not going to be provided by an expert witness. *Contrast with Taylor*, 484 U.S. at 417 (quoted in *Pulinario*, 2004 WL 2980384, at **2) (observing that "[i]n *Taylor*, preclusion was permissible because the totality of the circumstances indicated that 'the case fit [ ] into the category of willful misconduct in which the severest sanction is appropriate'") (alteration in *Pulinario*, *supra*).

After reviewing the transcript, the relevant portions of which have been quoted above, the trial court considered only whether C.P.L. § 250.10(2)'s notice requirement had been satisfied, and did not consider the impact of her ruling on Petitioner's due process right to present a defense. The Second Circuit has held that "[i]n considering only whether § 250.10 had been satisfied, the state court failed to account for 'the fundamental character of the defendant's right to offer the testimony of witnesses in [her] favor.'" *Pulinario*, 2004 WL 2980384, at **4 (quoting *Taylor*, 484 U.S. at 414) (alteration in *Pulinario*). Even though I conclude the state trial court committed error, this is not the end of the inquiry; I must still determine whether the error was harmless. *E.g.*, *Pulinario*, 2004 WL 2980384, at **4. When a defendant's constitutional

rights have been violated as a result of trial error, the Supreme Court has applied the following test to determine, on collateral review, whether an error was harmless: In order to be harmful, the error must have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*.

The Court now turns to an assessment of the importance of the items of proof sought to be admitted at trial in support of Smith's proposed EED defense. As noted above, trial counsel asserted that he should be allowed to introduce evidence that the decedent was a "child molester." *E.g.*, T.40-41, 1049-52. This proposed evidence included (1) probate records of the decedent's wife which purportedly would have demonstrated that Petitioner had a sexual relationship with one of their foster children; (2) testimony from witnesses other than Petitioner about the decedent's sexual conduct; and (3) Petitioner's own testimony concerning her sexual relationship with the decedent and her state of mind at the time of the incident. *See id.*

As to the first category of evidence, the probate records, the Court does not find that such documentation was relevant or admissible under any exception to the rule against hearsay.

With regard to the second category, the proposed testimony from other witnesses about the decedent having engaged in illegal sexual conduct with minors other than Smith, it is not clear how such testimony would be relevant to support an EED defense. The defense deals with the mental and emotional state of the defendant, which certainly could include *her* knowledge of the victim's behavior. If the defendant did not know about such activities on decedent's part, then it is difficult to see how they could have affected her mentally or emotionally. In any event, evidence of this sort was admitted: One of Smith's friends, Martricia Gaskin, was actually

permitted to testify that the decedent had asked her out on a date. In addition, during Petitioner's trial testimony, she testified extensively about her knowledge of the sexual relationships the decedent had with a number of her young female friends. Respondent asserts that Petitioner's testimony did not indicate that she was aware of any adverse effect that the decedent's conduct toward these other young women had upon her. The Court agrees that this is a fair characterization after reading the transcript, and thus, Petitioner has not demonstrated how such evidence, given her testimony in this particular case, was important to an EED defense.

The Court turns to the third and final category of proposed evidence, Petitioner's own testimony concerning her sexual relationship with the decedent. This evidence certainly was material, since without it Smith did not have the possibility of an EED defense. However, the trial court, despite its preclusion ruling, nevertheless allowed defense counsel to extensively explore Petitioner's relationship with the victim as well as her mental and emotional state at the time of the murder since the trial court believed it was relevant to a self-defense charge. The defense's main evidence relevant to an EED defense thus was admitted, although the jury did not consider it in support of an EED defense because the trial court refused to so instruct the jury based upon its finding that the defense had not provided the required notice. Under the peculiar facts of this case, the preclusion error is hopeless entangled with the failure to charge issue: Was the preclusion error rendered harmless since the evidence was admitted? Or, was the preclusion error ultimately harmful because the EED jury charge was not given as a consequence thereof? Here, the state courts circumvented this conundrum by finding that the evidence presented relevant to an EED defense was not sufficient to entitle Petitioner to a jury instruction on that defense, and therefore the notice and preclusion issues did not need to be decided. For the

reasons discussed in the following section, the Court concludes that the state courts did not

clearly err in holding that an EED instruction was not warranted on an insufficiency-of-the-

evidence basis. This Court reads the New York Court of Appeals holding in *Smith* as saying that

any preclusion error in Smith's case did not affect the jury's verdict, after all was said and done.

Under the circumstances presented here, the Court concludes that its agreement with the state

courts on the jury charge question necessarily leads to a finding of harmlessness of the preclusion

error.

**B.      Due Process Violation:  Denial of Request to Issue Jury Instruction on Extreme Emotional Disturbance**

**1.      Was an Extreme Emotional Disturbance Jury Instruction Required Under New York State Law?**

**a.      Overview**

As the Second Circuit explained in *Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001), when a

habeas petitioner alleges that she was deprived of her right to present a defense by virtue of a trial

court's refusal to issue a requested jury instruction, the court must first determine whether Smith

was entitled to the charge as a matter of New York State law.  *Accord Buckner v. Burge*, 2010

WL 1328982, at *5 (E.D.N.Y. Mar. 31, 2010). Answering that question requires consultation

with state law and deference to the state-courts' interpretation of the state's laws, to the extent

that those interpretations are themselves constitutional.  *Davis v. Strack*, 270 F.3d at 123 n. 4.

**b.      New York Law on EED**

"Recognizing that some intentional homicides may result from "an understandable human

response deserving of mercy," *People v. Casassa*, 49 N.Y.2d 668, 680-81, 427 N.Y.S.2d 769,

404 N.E.2d 1310 (N.Y.), *cert. denied sub nom. Casassa v. New York*, 449 U.S. 842, 101 S.Ct.

122, 66 L.Ed.2d 50 (1980), the New York State Legislature created the affirmative defense of extreme emotional disturbance, which reduces intentional murder to first degree manslaughter if the defendant establishes its elements by a preponderance of the evidence." *Buckner*, 2010 WL 1328982, at *5 (citing N.Y. PENAL LAW §§ 125.20(2); 125.27(2)(a); *People v. Moye*, 66 N.Y.2d 887, 890, 498 N.Y.S.2d 767, 489 N.E.2d 736 (N.Y. 1985) (discussing the elements of the extreme emotional disturbance affirmative defense)). Extreme emotional disturbance is a statutory, partial affirmative defense that is available where "[t]he defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Vargas-Sarmiento v. United States Dept. of Justice*, 448 F.3d 159, 166 (2d Cir. 2006) (citing N.Y. PENAL LAW § 125.25(1)(a)).

The New York Court of Appeals has described the partial affirmative defense of extreme emotional disturbance has two elements. *E.g.*, *People v. Roche*, 98 N.Y.2d 70, 75-76 (N.Y. 2002); *see also Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir.2007), *cert. denied sub nom. Murden v. Ercole*, 552 U.S. 1150, 128 S.Ct. 1083, 169 L.Ed.2d 823 (2008). A defendant must first prove that he or she acted under the influence of an extreme emotional disturbance, and, second, that there was a reasonable explanation or excuse for that disturbance. *People v. Roche*, 98 N.Y.2d at 75-76; *Murden*, 497 F.3d at 194. "'The first, subjective element is met if there is evidence that [the] defendant's conduct at the time of the incident was *actually influenced* by an extreme emotional disturbance.'" *Murden*, 497 F.3d at 195, 745 N.Y.S.2d 775, 772 N.E.2d 1133 (quoting *People v. Roche*, 98 N.Y.2d at 75-76, 745 N.Y.S.2d 775, 772 N.E.2d 1133) (emphasis added); *see also People v. Casassa*, 49 N.Y.2d 668, 678-79 (N.Y. 1980) ("The first requirement is wholly subjective[,] i.e., it involves a determination that the particular defendant did in fact act

under extreme emotional disturbance, that the claimed explanation as to the cause of his action is not contrived or sham."). The "threshold question," *Casassa*, 49 N.Y.2d at 680, is whether the defendant killed the victim "while under the influence of [an] 'extreme emotional disturbance[,]'" *id.* This question "must be answered in the affirmative before any test of reasonableness is required[,]" *id. See also* N.Y. Pattern Criminal Jury Instructions ("Extreme Emotional Disturbance").

The second, objective element of EED is the "reasonableness" prong of the defense and "'requires proof that [the] defendant's emotional disturbance was supported by a reasonable explanation or excuse.'" *Id.* (quoting *Roche*, 98 N.Y.2d at 76). This "more difficult to describe," *People v. Casassa*, 49 N.Y.2d at 679, element is "determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception have may been, and assessing from that standpoint whether the explanation or excuse for the emotional disturbance was reasonable[,]" *id.*; *accord People v. Roche*, 98 N.Y.2d at 76; *see also Murden*, 497 F.3d at 195.

Entitlement to a jury instruction on the defense of EED requires presentation of sufficient evidence to find that the elements of the defense have been satisfied by a preponderance of the evidence, viewing the evidence in the light most favorable to the defense. *Zamora v. Phillips*, No. 04-CV-4093, 2006 U.S. Dist. LEXIS 55434, at *17, 2006 WL 2265079 (E.D.N.Y. Aug. 8, 2006) (citing *People v. Moye*, 66 N.Y.2d 887, 889-90, 498 N.Y.S.2d 767, 769, 489 N.E.2d 736, 738 (1985)). The Second Circuit has explained that "[i]n determining whether a petitioner was entitled to a defense under state law, federal courts must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional."

*Davis v. Strack*, 270 F.3d at 124 n.4 (internal citations omitted). Stated another way, this Court sitting in habeas review is not charged with interpreting New York's law on extreme emotional disturbance, but rather with determining whether the evidence was sufficient to warrant an EED charge under New York law. *See id.* ("In other words, our role [in reviewing a § 2254 habeas petition] here is not to interpret New York's law of justification, but to determine whether the evidence was sufficient to warrant a justification charge under that law."). The New York Court of Appeals has offered the following explication for determining this question:

> Where the issue on appeal is whether a particular defense should have been charged to the jury, the evidence is viewed in the light most favorable to the defendant. For the defendant to be entitled to a charge on extreme emotional disturbance, sufficient evidence must be presented for the jury to find by a preponderance of the evidence that the elements of the affirmative defense are satisfied.
> . . .
> In determining whether to submit the affirmative defense of extreme emotional disturbance to the jury, it is for the court initially to decide if there is sufficient credible evidence for the jury to determine that, by a preponderance of the evidence, the elements of the defense are established. . . . It is then for the jury to resolve inconsistencies in testimony and reach conclusions as to the "volitional, deliberate and calculated" nature of defendant's acts[.]

*People v. Moye*, 66 N.Y.2d at 889 & 890 n.* (internal and other citations omitted; quotation omitted)).

### c.    The State Courts' Rulings on Whether Petitioner Was Entitled to an EED Charge

At the close of the proofs, defense counsel requested that the trial court jury charge the jury on the EED defense. T.1090-91. The trial court declined, stating, "there's been evidence to – I'm not going to charge extreme emotional disturbance." T.1091, *see also*, T.1098. The trial court did agree to give the standard charges on self-defense/justification with regard to defensive

-34-

use of deadly physical force, N.Y. PENAL LAW § 35.15(2)(a), and the defensive use of deadly physical force against a rape or sodomy, or attempt to commit a rape or sodomy, *id.*, § 35.15(2)(b). T.1094-95. On direct appeal, the Appellate Division held that the trial judge properly denied the defense request to charge the jury on EED.The New York Court of Appeals, after granting leave to appeal, affirmed the Appellate Division's affirmance of the conviction but rested its decision upon a different rationale:

> [T]here was an insufficient offer of proof by defendant in support of an extreme emotional disturbance defense. Defendant's proffered testimony did not establish that, at the time of the homicide, she was affected by her longstanding sexual relationship with the deceased to such a degree that a jury could reasonably conclude that she acted under the influence of an extreme emotional disturbance (*see People v. White*, 79 N.Y.2d 900, 903, 581 N.Y.S.2d 651, 590 N.E.2d 236 (1992)).

*People v. Smith*, 1 N.Y.3d at 612, 808 N.E.2d at 334, 776 N.Y.S.2d at 199. In the present case, the Court of Appeals cited to *People v. White*, which considered whether a trial court properly refused to issue an EED instruction. Thus, this Court reads the New York Court of Appeals' decision in *Smith* as implying that even viewing the evidence in the light most favorable to the defense, Petitioner's testimony did not show, by a preponderance of the evidence, that she was actually acting under an extreme emotional disturbance at the time of the murder (the subjective part of the EED defense). *See People v. Moye*, 66 N.Y.2d at 889 & 890 n.*.

After reviewing Petitioner's testimony and the pertinent New York case law regarding the nature of the subjective and objective portions of the EED defense, this Court does not disagree with the New York Court of Appeals' reasonable conclusion that Petitioner's testimony did not establish, by a preponderance of the credible evidence, the subjective element of EED which requires a concomitant a loss of self control. *E.g.*, *People v. Moye*, 66 N.Y.2d at 890. Smith's

testimony was that she was frightened and perhaps even angry at the decedent.[14] However, Smith's testimony about her state of mind and her description of her actions just prior to, during, and immediately following the murder do not convey the loss of self control that is the crux of the subjective, "mental infirmity" aspect of the EED defense as articulated by New York case law. It was only at the end of Smith's description of the incident did there come any testimony concerning her purported loss of control. It was contained in the following question and answer: Trial counsel asked her, "Are you saying you lost control of yourself, Patrice?" Petitioner replied, "Yes." T.891. Beyond this obviously leading question by trial counsel, and simple affirmative answer by Petitioner, there was no elaboration by Petitioner on this issue. This Court has reviewed the record and cannot discern anything else in Petitioner's testimony that expressly or impliedly attempted to convey that she lost control of herself as a result of her relationship with the decedent or their prior interactions.

Thus, giving the appropriate measure of deference to the state court's determination on this issue of New York law, this Court cannot conclude that the denial of the EED charge was erroneous as a matter of New York state law. "[D]ue process does not require the giving of a jury instruction when such charge is not supported by the evidence." *Blazic v. Henderson*, 900 F.2d 534, 541 (2d Cir. 1990) (citing *Hooper v. Evans*, 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72

---

[14]       In determining whether a petitioner has acted out of a loss of self control, the court will look at the petitioner's conduct before and after the homicide. *E.g.*, *People v. Dominguez*, 226 A.D.2d 391, 640 N.Y.S.2d 583, 583-84 (1996); *People v. Feris*, 144 A.D.2d 691, 535 N.Y.S.2d 17, 18 (1988). For example, in *Dominguez*, the court found that, although the petitioner claimed to be frightened at the time he shot the victim, his actions after the shooting were inconsistent with the loss of self control associated with the defense of extreme emotional disturbance. 640 N.Y.S.2d at 583-84. In that case, the defendant fled the scene of the shooting, disposed of the murder weapon, consciously decided not to return home, and fled the state the following day. *Id.* The court found, under such circumstances, an instruction on extreme emotional disturbance was not warranted because there was insufficient evidence to support such a finding. *Id.*

L.Ed.2d 367 (1982); *Hallowell v. Keve*, 555 F.2d 103, 107 (3d Cir.1977)). Only if the habeas court determines that the failure to issue a requested jury charge constituted an error of state law must it consider whether the error "'so infected the entire trial that the resulting conviction violates due process.'" *Davis*, 270 F.3d at 131 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Here, the Court has found that the New York Court of Appeals' holding that an EED charge was not required at Smith's trial was not erroneous as a matter of New York state law. Based upon this finding, habeas relief cannot issue on this claim concerning the failure to charge EED. *See Davis v. Strack*, 270 F.3d at 124 ("We cannot grant relief . . . without answering three questions in the petitioner's favor. First, was the justification charge required as a matter of New York state law? Second, if so, did the failure to give the requested charge violate the standard set out in *Cupp*[?]. Third, if so, was the state court's failure of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254?").

### C. Ineffective Assistance of Trial Counsel – Failure to Consult with Psychiatric Expert

In support of her post-judgment motion for *vacatur* pursuant to C.P.L. § 440.10, Smith argued in Point I that (1) trial counsel was ineffective in failing to obtain a psychiatric evaluation of her in order to investigate her "mental competency and momentary insanity at the time of the offense violated her Sixth Amendment right to effective assistance of counsel and a fair trial" and (2) trial counsel was ineffective in attempting instead to introduce lay testimony supporting the the partial affirmative defense of extreme emotional disturbance, *see* N.Y. PENAL LAW § 125.25(1)(a).

At trial, defense counsel sought to present non-expert testimony that Smith was under the

influence of an "extreme emotional disturbance" when she and her co-defendant strangled and beat the victim to death. The prosecutor objected to such testimony because defense counsel failed to comply with the notice requirement set forth in C.P.L. § 250.10. After hearing argument from both sides, the trial court determined that the extreme emotional defense was precluded due to counsel's failure to give notice of his intent to offer "psychiatric evidence," N.Y. Crim. Proc. Law § 250.10(2).

To succeed on a petition for habeas corpus based upon ineffective assistance of counsel, a petitioner must show both that (1) her counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time, and (2) that counsel's deficient performance was prejudicial to the petitioner's defense in that there is a reasonable probability that but for counsel's errors, the result of petitioner's criminal proceeding would have been more favorable to petitioner. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord*, *e.g., Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007); *Bunkley v. Meachum*, 68 F.3d 1518, 1521 (2d Cir.1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. As to the "performance" prong, the petitioner must establish that her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. The Supreme Court has reiterated that there is a "strong presumption" that counsel's conduct fell within the broad spectrum of what constitutes "reasonable" professional assistance, and a defendant bears the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1985) (citing *Strickland*, 466 U.S. at 688-89). "[T]here is no

reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697

"Trial counsel's decision whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation.'" *Cotto v. Lord*, No. 99 Civ. 4874(JGK), 2001 WL 21246, at *12 (S.D.N.Y. Jan. 9, 2001) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.), *cert. denied*, 522 U.S. 846 (1997) and citing *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (citing *Schmidt*, 105 F.3d at 90); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.")). Given that expert psychiatric testimony is not required to establish the defense of extreme emotional disturbance, *see*, *e.g.*, *People v. Moye*, 489 N.E.2d 736, 738 (N.Y.1985); *DeLuca v. Lord*, 77 F.3d 578, 586 (2d Cir.1996), it is difficult to say that trial counsel's alleged failure to consult with a psychiatrist was *per se* unreasonable. Furthermore, Smith has not submitted an affidavit from a proposed expert psychiatrist or psychologist, or provided any medical records or reports from the three, unidentified psychiatrists whom she claims examined her at an unspecified times, let alone any information as to the contents of these alleged reports. She thus has not provided the Court with any basis for discerning how trial counsel's decision not to have her examined by a psychiatrist would have contributed helpfully to her building an EED defense. The Court accordingly cannot find that Smith was prejudiced by this alleged error on trial counsel's part.

### C.    Fifth Amendment Violation – Erroneous Admission of a Coerced Confession

As Point 2 of her C.P.L. § 440.10 motion, Petitioner argued that her confession to the

police was coerced because the interrogating officers allegedly threatened her that "should she not say anything than [sic] she would receive the 'Death Penalty'" and "yelled" at her "until she was hysterically crying." Petitioner's C.P.L. § 440.10 Motion at Point 2. The motion court denied this claim based on the mandatory procedural rule set forth in C.P.L. § 440.10(2)(c),[15] finding that "[s]ufficient facts appear in the record to have permitted review of [this] issue[ ] on direct appeal." C.P.L. § 440.10 Order at 3. Because Petitioner failed to raise the evidentiary issue before the Appellate Division, the motion court found, she was "not entitled to collateral review[.]" *Id.* (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c); *People v. Cooks*, 67 N.Y.2d 100, 103 (N.Y. 1986) (holding that dismissal of claim attacking sufficiency of a plea allocution by defendant's failure to preserve the issue, otherwise available on direct appeal, for such review).

As noted above in this Decision and Order, "[f]ederal courts may not review state court decisions that rest on an adequate and independent state procedural default unless petitioner can show both cause and prejudice [for the procedural default]." *Fama v. Commissioner of Correctional Servs.*, 235 F.3d 804, 809 (2d Cir. 2000). A procedural bar is "adequate" if it is "based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). The Second Circuit has "deferred to findings of procedural default as long as they are supported by a 'fair or substantial basis' in state law."

---

[15]    "Notwithstanding the provisions of subdivision one [of C.P.L. § 440.10], the court must deny a motion to vacate a judgment when: . . . (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him . . . ." N.Y. CRIM. PROC. LAW § 440.10(2)(c).

*Garcia*, 188 F.3d at 78. In particular, the Second Circuit has found C.P.L. § 440.10(2)(c) to be an adequate and independent state ground resulting in the procedural default of record-based claims). *E.g.*, *Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003); *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir.2001); *Levine v. Commissioner of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995). Based on the record before the Court, there is a "fair or substantial basis" in state law for the motion court's finding of procedural default regarding Smith's claim of evidentiary error. Accordingly, this contention cannot be reviewed unless she can show both cause for and prejudice resulting from the default. *See Fama*, 235 F.3d at 809. Petitioner has shown neither cause for the procedural default, prejudice resulting therefrom; nor has she made the showing of "factual innocence" necessary for the fundamental miscarriage of justice exception. *See Coleman*, 501 U.S. at 750, 111 S.Ct. at 2565. The fundamental miscarriage of justice exception narrowly applies only to those cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Accordingly, this claim is dismissed as procedurally defaulted.

### D. Evidentiary Error – Failure to Admit Testimony by Petitioner's Mother

Point II raised Smith's C.P.L. § 440.10 motion was that the trial court erred in sustaining the prosecutor's objections to defense counsel's questions to Petitioner's motion concerning a telephone call that Petitioner allegedly made to her mother while she was being interrogated by the police. The motion court rejected the claims based on the mandatory procedural rule set forth in C.P.L. § 440.10(2)(c), finding that "[s]ufficient facts appear in the record to have permitted review of [this] issue[ ] on direct appeal." C.P.L. § 440.10 Order at 3. Because Petitioner failed

to raise the evidentiary issue before the Appellate Division, the motion court found, she was "not entitled to collateral review[.]" *Id.* (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c); *People v. Cooks*, 67 N.Y.2d 100, 103 (N.Y. 1986) (holding that dismissal of claim attacking sufficiency of a plea allocution by defendant's failure to preserve the issue, otherwise available on direct appeal, for such review)

As noted above in this Decision and Order, "[f]ederal courts may not review state court decisions that rest on an adequate and independent state procedural default unless petitioner can show both cause and prejudice [for the procedural default]." *Fama v. Commissioner of Correctional Servs.*, 235 F.3d 804, 809 (2d Cir. 2000). A procedural bar is "adequate" if it is "based on a rule that is 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)). The Second Circuit has "deferred to findings of procedural default as long as they are supported by a 'fair or substantial basis' in state law." *Garcia*, 188 F.3d at 78.

Based on the record before the Court, there is a "fair or substantial basis" in state law for the motion court's finding of procedural default regarding Smith's claim of evidentiary error. Because of the default on direct appeal and on collateral review, federal habeas review of these claims is barred unless Smith can show either "cause" for the default and resultant "prejudice," or make a demonstration of "actual innocence." *Dretke v. Haley*, 541 U.S. at 393 (2004). Smith has not attempted to make such a showing of cause and prejudice, and neither is apparent on the record before. Furthermore, Smith has not demonstrated her "actual innocence" so to warrant the narrow fundamental-miscarriage-of-justice exception to the cause requirement Accordingly,

these claims are barred from habeas review.

### E.    Prosecutorial Misconduct

As Point 4 of her C.P.L. § 440.10 motion, Petitioner argued that the prosecutor, during summation, improperly accused Petitioner of lying. The motion court dismissed this claim on the basis of C.P.L. § 440.10(2)(c) since sufficient facts appeared on the record to have allowed review of the issue on direct appeal. C.P.L. § 440.10 Order at 3 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c); *People v. Cooks*, 67 N.Y.2d at 103).

As was the case with the evidentiary and confession claims, the motion court's reliance upon C.P.L. 440.10(2)(c) to dismiss Petitioner's claim of prosecutorial misconduct constituted an adequate and independent state ground resulting in the procedural default of the claim on federal habeas review. As discussed above in this Decision and Order, there is no basis to excuse the procedural default barring Smith's prosecutorial misconduct claim. Accordingly, it is dismissed on that basis.

### F.    Insufficiency of the Evidence to Support the Convictions

Smith contends that the prosecution adduced legally insufficient evidence to convict her of felony murder and the underlying charge of first degree robbery. In particular, Smith asserts that the prosecution failed to prove that she went to the victim's home intending to steal his car. The Appellate Division summarily rejected this contention as "without merit" on direct appeal. *People v. Smith*, 299 A.D.2d at 941, 750 N.Y.S.2d at 731. The New York Court of Appeals held that "[d]efendant's challenge to the sufficiency of the evidence supporting her felony murder conviction is without merit." *People v. Smith*, 1 N.Y.3d at 612.

A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus

proceeding "bears a very heavy burden." *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 813 (2d Cir.2000). Habeas corpus relief must be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *accord, e.g, People v. Contes*, 60 N.Y.2d 620, 621 467 N.Y.S.2d 349, 349-350 (N.Y.1983). This sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Under the *Jackson* standard for reviewing evidentiary sufficiency, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *accord Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) ( "[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal."). The court must determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt . . . view [ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.1983) (internal citations omitted), *cert. denied sub nom. Mont v. United States*, 462 U.S. 1108 (1983). A federal court reviewing an insufficiency-of-the-evidence claim must look to state law to determine the elements of the crime. *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999) (citation omitted), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000).

      Under New York State law, a defendant is guilty of felony murder if he commits or

attempts to commit robbery, and in the course of and in furtherance of the crime or of immediate flight therefrom, he causes a death. N.Y. PENAL LAW § 125.25(3). Robbery is forcible stealing. *Id.* § 160.00. Intent to cause death or injury is not an element of felony murder, only intent to commit the underlying felony of robbery. "'The defendant may be convicted of felony murder only if he formed the intent to commit the robbery *before* the victim's death.'" *Vega v. Griener*, No. 97 CV 2336(NG), 2002 WL 31409364, at *4 (E.D.N.Y. July 17, 2002) (emphasis supplied) (quoting *Al-Matin v. Kuhlmann*, No. 95 CIV. 10748 (LLS), 1996 WL 339995, at *4 (S.D.N.Y. 1996), *aff'd*, 116 F.3d 465 (2d Cir. 1997) and citing *People v. Joyner*, 26 N.Y.2d 106, 109, 308 N.Y.S.2d 840, 257 N.E.2d 26 (1970) (finding that the defendant could not be convicted of felony murder if his "intent to commit the felony, robbery . . . came into being after the defendant had killed his victim").

   With these legal principles in mind, I must conclude that there was legally sufficient evidence to support the jury's inference that before Robinson's death, Smith intended to rob him. There was testimony from one of Petitioner's acquaintances (Gaskin) that, a couple months before the murder, Petitioner had attempted to recruit her help in robbing the victim, but Gaskin had declined. Petitioner's friends, Winston and Goosby, testified that Petitioner told them that she and co-defendant Mitchell had taken the bus to the victim's house in order to rob him. Thus, the prosecution presented evidence from which a rational jury could have inferred that Petitioner had come to the victim's house that evening with a predetermined plan to commit robbery.

   Although Petitioner testified at trial that she had lied to the police when she made her two statements during questions, her second statement contains an assertion that the victim was still alive when they left the house. "As the sole judge of credibility, *see*, *e.g.*, *United States v.*

*Strauss*, 999 F.2d 692, 696 (2d Cir. 1993), the jury was entitled to credit portions of [Petitioner]'s statements and discredit others." *Al-Matin v. Kuhlmann*, 1996 WL 339995, at *5.

*See also Vega v. Griener*, 2002 WL 31409364, at *4 ("Contrary to petitioner's argument, the jury was not required to accept the truth of petitioner's statement to the police that the robbery was an afterthought, and was free to accept only portions of that statement or to reject it in its entirety and conclude, based on the undisputed facts that Morilla was found beaten, bound and gagged while petitioner was caught in the act of taking his jewelry, that petitioner decided to rob Morilla at an earlier time and inflicted the fatal injuries in execution of that crime.") (citation omitted). Thus, even if the jury rejected the testimony of Gaskin, Goosby, and Winston that Smith had formed a plan to rob the victim well before arriving at his house that night, the jury could have accepted that portion of Smith's statement that the victim was still alive when she left the house, taking his car keys and driving off in his car. The jury could have inferred that even if Petitioner had not formed the intent to steal the car before going over to the victim's house, based on the fact that she and Mitchell rode the bus there, she decided to rob him while he was still alive.

Based upon Petitioner's actions in regard to the Cadillac, a jury would not have been unreasonable in concluding that she intended to steal the car rather than borrow it. She parked the victim's car just around the corner from her house; notably, she did not live near the victim's house. In addition, she retained possession of the car keys after leaving it parked on the street. A rational jury could have rejected the defense theory that Petitioner had merely taken the Cadillac for a "joy ride" and could have concluded from her actions that she was intending to keep the car.

Considering all of the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in its favor, and deferring to the jury's assessment of witness credibility

and the jury's resolution of conflicting testimony, as it must do under the law, this Court cannot say that the jury was irrational in finding that the prosecution adduced sufficient proof that the victim was alive when Petitioner decided to rob him and that the victim's death occurred during the execution of the robbery. Accordingly, I cannot find that Smith has met her "heavy burden," *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir.2002) (internal citations omitted), *cert. denied*, 537 U.S. 955 (2002), of showing that the evidence was legally insufficient so as to violate her Fourteenth Amendment's Due Process Clause protection against being convicted without proof of the elements of the crime with which she was charged beyond a reasonable doubt.

## IV. Conclusion

For the reasons stated above, petitioner Patrice Smith's petition for a writ of habeas corpus is dismissed. Because the Court finds that Smith has not made a "substantial showing," 28 U.S.C. § 2253(c)(2), of the denial of a constitutional right, the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 29, 2010
Buffalo, New York.